## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ELI JOSEPH RUFFING and CHELSI ANN RUFFING, his wife,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| **v.** | **NO: 2:25-cv-01888-DSC** |
| **MPW INDUSTRIAL SERVICES, INC. and CRANE COMPANY,** | |
| **Defendants.** | |

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL JURISDICTIONAL FACTS IN SUPPORT OF MOTION TO REMAND

Plaintiffs, Eli Joseph Ruffing and Chelsi Ann Ruffing, respectfully submit this Notice of Supplemental Jurisdictional Facts in Support of their Motion to Remand (ECF No. 4), filed December 22, 2025, to bring to the Court's attention newly discovered jurisdictional facts that independently mandate remand under 28 U.S.C. § 1447(c).

## I.    INTRODUCTION

This case was removed on the basis of a Praecipe for Writ of Summons filed in the Court of Common Pleas of Allegheny County on November 5, 2025. No Complaint has been filed. Under Third Circuit precedent, a Pennsylvania writ of summons is not an "initial pleading" within the meaning of 28 U.S.C. § 1446(b)

1

and cannot support removal. *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 223 (3d Cir. 2005); *Kempf v. Wash. Cty.*, No. 2:15-cv-00486-TFM, 2015 WL 1608456, at *2 (W.D. Pa. Apr. 14, 2015) (ECF 4-1, Ex. to Pls.' Mot. to Remand).

Since filing the Motion to Remand, Plaintiffs have identified supplemental jurisdictional facts, specifically, a Pennsylvania forum defendant, Valves, Inc., whose joinder will independently destroy diversity jurisdiction and require remand under the forum-defendant rule, 28 U.S.C. § 1441(b)(2).

## II.  **NO COMPLAINT HAS BEEN FILED; REMOVAL REMAINS PREMATURE**

As of the date of this filing, no Complaint has been served or filed in this action. The only operative state-court document is the November 5, 2025 Praecipe for Writ of Summons, which Crane Company ("Crane") used as the basis for its December 5, 2025 Notice of Removal.

The Third Circuit has held unequivocally that a writ of summons is not an initial pleading that triggers the time for removal. *Sikirica*, 416 F.3d at 223. The removal statute, 28 U.S.C. § 1446(b), requires that the defendant receive "a copy of the initial pleading setting forth the claim for relief" before the thirty-day removal period begins. A writ of summons does not "set forth the claim for relief"; only a complaint does. *Id.*; *Kempf*, 2015 WL 1608456, at *2.

This Court has previously recognized that removal based on a writ of summons alone is "premature" and that "where no complaint has been filed, as the case is here, removal is improper." *Kempf*, 2015 WL 1608456, at *1 (quoting *Ball v. Metro. Life Ins. Co.*, No. 3:14-cv-0239, 2014 WL 806423, at *1 (M.D. Pa. Feb. 28, 2014)). This bright-line rule exists because:  (1) Federal Rule of Civil Procedure 3 provides that an action is commenced by filing a complaint, not a writ. *Gervel v. L & J Talent*, 805 F. Supp. 308, 309 (E.D. Pa. 1992); (2)Without a complaint, the Court cannot be sure it has subject-matter jurisdiction over the claims being removed. *Id.*; and (3) Allowing removal of a writ would create "a form of action that does not exist under the Federal Rules" and leave the Court with no procedural mechanism to address the writ. *Id.*

Here, Plaintiffs used the writ-plus-pre-complaint-discovery procedure authorized by Pa.R.C.P. 4003.8 to identify responsible parties and develop the factual basis for claims arising from the August 11, 2025 Clairton Coke Works explosion. Plaintiffs have not yet filed a Complaint because pre-complaint discovery is ongoing. The removal period has not begun to run. Crane's removal is therefore procedurally defective and void, and remand is mandatory. 28 U.S.C. § 1447(c).

III.   **NEWLY IDENTIFIED FORUM DEFENDANT INDEPENDENTLY DESTROYS DIVERSITY**

Since filing the Motion to Remand, Plaintiffs have identified Valves, Inc., a Pennsylvania corporation with its registered address in Allegheny County, Pennsylvania (525 William Penn Place, Pittsburgh, PA 15219), as a defendant whose joinder is both appropriate and necessary.

### A.   *Valves, Inc.'s Role in the August 11, 2025 Explosion*

Valves, Inc. is a specialized value refurbishment company who was contracted in 2013 to perform the service of evaluating and refurbishing the Battery 13 isolation gas valve that cracked and caused the explosion.  As detailed in a related wrongful-death complaint filed February 19, 2026 in the Court of Common Pleas of Allegheny County, *Quinn v. Nippon Steel N. Am., Inc.*, GD-26-001916 (attached as **Exhibit A**), Valves, Inc. negligently failed to advise U.S. Steel that the aged cast iron valve was unsuitable for continued service in a critical coke oven gas isolation application, and that replacement with a modern steel valve was required. *See* **Ex. A** ¶¶ 82–99, 167–169 (Count III). Valves, Inc.'s professional duty as a valve refurbishment expert included recognizing and communicating that:

    a.     Cast iron is inherently brittle and susceptible to thermal shock and stress corrosion, particularly after sixty years of operation in coke oven gas service. *Id.* ¶¶ 85–88.

    b.      Refurbishing internal components cannot remedy the fundamental problem of a brittle, aged cast iron pressure vessel that has reached the end of its safe service life. *Id.* ¶¶ 92–93.

    c.      Replacement with a modern steel valve was the appropriate and necessary course of action. *Id.* ¶¶ 94, 99–100.

Valves, Inc.'s failure to provide this critical safety advice was a substantial contributing factor to the valve remaining in service until its catastrophic failure on August 11, 2025. *Id.* ¶ 97. Had Valves, Inc. fulfilled its professional duty and recommended replacement in 2013, U.S. Steel would likely have installed a modern steel valve, and that valve would not have failed during the August 11, 2025 maintenance operation. *Id.* ¶ 98.

Plaintiffs intend to assert identical negligence claims against Valves, Inc. in this action, arising from the same nucleus of operative facts.

### B.    Valves, Inc. Is a Proper and Necessary Party

Valves, Inc.'s citizenship is Pennsylvania, where it is incorporated and maintains its registered office. *Id.* ¶ 10. Its joinder will destroy complete diversity under 28 U.S.C. § 1332(a)(1), as Plaintiffs are also citizens of Pennsylvania.

Moreover, Valves, Inc. is not a fraudulently joined defendant. Fraudulent joinder exists only where "there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant." *Hogan v. Raymond Corp.*, 536 F. App'x 207, 210–11 (3d Cir. 2013). Here:

a.  Valves, Inc. performed refurbishment services on the valve that failed.

b.  Valves, Inc. possessed superior technical expertise regarding valve materials, design limitations, and suitability for coke oven gas service. **Ex. A** ¶¶ 90, 93.

c.  Valves, Inc. owed a professional duty to advise against returning an aged, brittle cast iron valve to high-consequence service. *Id.* ¶¶ 94–95.

d.  Pennsylvania law recognizes negligent failure to warn as an independent tort. *See, e.g.*, *Beech Aircraft Corp. v. Jinkins*, 739 F.2d 805, 809 (3d Cir. 1984) (applying Pennsylvania law).

Plaintiffs' claim against Valves, Inc. is factually and legally colorable and was identified through the very pre-complaint discovery process authorized by Pennsylvania Rule 4003.8 and contemplated in Plaintiffs' Motion to Remand. *See* Mot. to Remand ¶ 2 (ECF 4) (Plaintiffs' pre-complaint discovery seeks identification of responsible parties, including the "Pennsylvania-based vendor that refurbished the subject valve in 2013").

### C.  The Forum-Defendant Rule Bars Removal Once Valves, Inc. Is Joined

Under 28 U.S.C. § 1441(b)(2), "[a] civil action otherwise removable solely on the basis of [diversity] jurisdiction . . . may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."

Once Plaintiffs file a Complaint naming Valves, Inc., a Pennsylvania defendant in an action brought in Pennsylvania, diversity removal is categorically barred, even if Valves, Inc. is later dismissed or found not liable. *See, e.g.*, *Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147, 152 (3d Cir. 2018) (forum-defendant rule applies if defendant is "properly joined").

Crane's attempt to remove this case on diversity grounds is therefore futile. Plaintiffs will file a Complaint in state court naming Valves, Inc., and diversity jurisdiction will be absent from inception.

## IV.    <u>REMAND IS MANDATORY UNDER § 1447(C)</u>

Section 1447(c) provides: "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c) (emphasis added).

Here, the Court lacks subject-matter jurisdiction for two independent reasons:

1.    No Complaint has been filed, and removal based solely on a writ of summons is premature and procedurally defective under *Sikirica*. The "initial pleading" triggering § 1446(b) does not yet exist.

2.    A Pennsylvania forum defendant (Valves, Inc.) whose joinder is both appropriate and imminent will destroy diversity jurisdiction under § 1441(b)(2).

Removal statutes are strictly construed, and all doubts must be resolved in favor of remand. *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990).

Where, as here, the removing defendant cannot establish a valid basis for federal jurisdiction, remand is mandatory.

## V.    <u>CONCLUSION</u>

This case should never have been removed. Crane filed its Notice of Removal based on a procedural vehicle, a writ of summons, that the Third Circuit has held cannot support removal. Plaintiffs have now identified a Pennsylvania defendant whose joinder independently eliminates diversity jurisdiction.

The Court should remand this action to the Court of Common Pleas of Allegheny County pursuant to 28 U.S.C. § 1447(c) and award Plaintiffs their costs and fees incurred as a result of the improper removal.

WHEREFORE, Plaintiffs respectfully request that the Court:

1.    Grant Plaintiffs' Motion to Remand (ECF No. 4);

2.    Remand this action to the Court of Common Pleas of Allegheny County;

3.    Award Plaintiffs their costs and reasonable attorney's fees incurred as a result of the improper removal pursuant to 28 U.S.C. § 1447(c); and

4.    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**FANELLI, EVANS AND PATEL, P.C.**

By: */s/ Albert J. Evans*
    ALBERT J. EVANS, ESQUIRE
    Attorney I.D. #68872
    No. 1 Mahantongo Street
    Pottsville, PA 17901
    (570) 622-2455
    aevans@feplawyers.com

**PROVOST UMPHREY LAW FIRM, LLP**

By: */s/ Edward Fisher*
    EDWARD FISHER, ESQUIRE
    Attorney I.D. #787471
    350 Pine Street | Suite 1100
    Beaumont, TX 77701
    (409) 835-6000
    efisher@provostumphrey.com

DATED: February 26, 2026        ***Counsel for Plaintiffs***

*EXHIBIT "A"*

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| TRISHA LYNN QUINN, individually and as Administrator of the Estate of TIMOTHY L. QUINN, | CIVIL DIVISION |
| Plaintiff, | Case No.:  GD26-001916 |
| v. | **COMPLAINT IN CIVIL ACTION** |
| NIPPON STEEL NORTH AMERICA, INC., MPW INDUSTRIAL SERVICES, INC., and VALVES, INC., | Filed on Behalf of: Plaintiff |
| Defendants. | Counsel of Record for This Party: |

**BRENDAN B. LUPETIN, ESQUIRE**
PA I.D. No.: 201164
LUPETIN & UNATIN, LLC
310 Grant Street
Suite 3204 Grant Building
Pittsburgh, PA 15219
P: 412-281-4100
E: blupetin@pamedmal.com

**BENJAMIN J. BAER, ESQ.**
PA. I.D. No.: 205779
INJURY LAW PARTNERS
1628 JFK Boulevard, Suite 1302
Philadelphia, PA 19103
P: (215) 402-5900
E: bbaer@injurylawpartners.com

**JURY TRIAL DEMANDED**

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| TRISHA LYNN QUINN, individually and as Administrator of the Estate of TIMOTHY L. QUINN, | **CIVIL DIVISION** |
| | Case No.: |
| Plaintiff, | |
| v. | |
| NIPPON STEEL NORTH AMERICA, INC., MPW INDUSTRIAL SERVICES, INC., and VALVES, INC., | |
| Defendants. | |

## <u>NOTICE TO DEFEND</u>

YOU HAVE BEEN SUED IN COURT.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the Plaintiffs.  You may lose money or property or other rights important to you.  **YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

IF YOU CANNOT AFFORD A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ON AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

**Lawyer Referral Service – The Allegheny County Bar Association**
**Third Floor Koppers Building**
**436 Seventh Avenue**
**Pittsburgh, PA 15219**
**(412) 261-5555**

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

TRISHA LYNN QUINN, individually and as
Administrator of the Estate of TIMOTHY L.
QUINN,

      Plaintiff,

    v.

NIPPON STEEL NORTH AMERICA, INC.,
MPW INDUSTRIAL SERVICES, INC., and
VALVES, INC.,

      Defendants.

CIVIL DIVISION

Case No:

## <u>COMPLAINT IN CIVIL ACTION</u>

AND NOW, comes the Plaintiff, Trisha Lynn Quinn, individually and as Administrator of

the Estate of Timothy L. Quinn, by and through his counsel, Brendan B. Lupetin, Esquire, and

Lupetin & Unatin, LLC and files the following COMPLAINT IN CIVIL ACTION and in support

aver as follows:

1.     Plaintiff, Trisha Lynn Quinn, is the Administrator of the Estate of Timothy L.

Quinn, deceased ("Decedent" or "Mr. Quinn"), having been so appointed by the Register of Wills

for the County of Westmoreland, in the Commonwealth of Pennsylvania, on October 2nd, 2025.

See copy of the Short Certificate attached hereto as Exhibit "A."

2.     Plaintiff brings this action in her capacity as Administrator on behalf of the Estate

pursuant to the Survival Act, 42 Pa. C.S. § 8302, and on behalf of the beneficiaries pursuant to the

Wrongful Death Act, 42 Pa. C.S. § 8301.

3.     Trisha L. Quinn is the sister of Decedent and is an adult individual resident of

Westmoreland County, Pennsylvania.

4.    In addition to the Plaintiff, Decedent is survived by his three children, Jeremiah Quinn, Lilliana Quinn, and Teagan Quinn, who are each individual residents of Westmoreland County.

5.    Jeremiah Quinn, Lilliana Quinn, and Teagan Quinn are the children of the Decedent and are the statutory beneficiaries entitled to recover damages in this action pursuant to 42 Pa. C.S. § 8301 and Pa. R.C.P. No. 2202.

6.    This Complaint is filed in accordance with the notice and pleading requirements of Pa. R.C.P. No. 2204.

7.    This instant matter is brought on behalf of the beneficiaries pursuant to 42 Pa. C.S. § 8301 and Pa. R.C.P. No. 2202.

8.    Defendant Nippon Steel North America, Inc. ("Nippon Steel") is a Texas corporation with registered address of 920 Memorial City Way, Suite 700, Houston, TX 77024. At all times relevant hereto Nippon Steel regularly conducted business in Allegheny County, Pennsylvania.

9.    Defendant MPW Industrial Services, Inc. ("MPW"), is an Ohio Corporation licensed to do business in the Commonwealth of Pennsylvania located at 9711 Lancaster Road, Hebron, Ohio 43025.  At all times relevant hereto MPW regularly conducted business in Allegheny County, Pennsylvania.

10.    Defendant Valves, Inc. is a Pennsylvania corporation with registered address in Allegheny County of 525 William Penn Place Pittsburgh, PA 15219. At all times relevant hereto Valves, Inc., regularly conducted business in Allegheny County, Pennsylvania.

11.    At all times relevant hereto, Defendants Nippon Steel, MPW, and Valves, Inc.,

(collectively "Defendants") acted by themselves and by and through their agents, servants, and employees, including actual and/or apparent agents.

## JURISDICTION & VENUE

12.    This Court has personal jurisdiction over Valves, Inc., under 42 Pa.C.S. § 5301(a)(2)(1) because this Defendant is incorporated under, a sovereign of, and/or domiciled in, Allegheny County, Pennsylvania and its tortious acts or omissions occurred in Pennsylvania.

13.    This Court has personal jurisdiction over Defendants Nippon Steel and MPW, under 42 Pa.C.S. § 5301(a)(2)(iii) and § 5322(a) because these companies carry on a systematic and continuous part of their general business in and the cause of action arose in the Commonwealth of Pennsylvania.

14.    Venue is proper in the Court of Common Pleas of Allegheny County pursuant to Pa. R.C.P. 2179(a)(2) because all of the defendants regularly conduct business there and it is the location where the cause of action arose.

## STATEMENT OF FACTS

### I.    U.S. Steel, the Clairton Coke Works Facility, and Coke Oven Gas

15.    The Clairton Coke Works facility, located in Clairton, Pennsylvania, is the largest metallurgical coke manufacturing facility in the Western Hemisphere, operating continuously since 1916.

16.    Metallurgical coke production involves heating raw coal to approximately 2,000°F for a minimum of eighteen hours in oxygen-free coke ovens, driving off volatile compounds and leaving carbon-rich coke used as fuel in steel blast furnaces.

17.    This heating process generates "coke oven gas," a highly flammable and toxic mixture consisting primarily of hydrogen (40-60%), methane (20-30%), nitrogen (3-15%), and

carbon monoxide (3-6%).

18.    Coke oven gas has a lower explosive limit of 4.4%, is less dense than air, and has an autoignition temperature of 1,065°F through its hydrogen component.

19.    At Clairton, coke oven gas is collected, processed in a separate unit, and returned through underground high-pressure piping to the coke batteries to be burned as fuel—creating an integrated but inherently hazardous closed-loop system throughout the facility.

20.    Coke oven gas contains residues including tar-like substances and particulates that accumulate in piping and valve seats over time, creating operational problems and requiring periodic maintenance and flushing procedures.

## II.    The Battery 13/14 Configuration and the Fatal Design Flaw

21.    At the time of the incident, U.S. Steel operated six coke batteries at Clairton, including Batteries 13 and 14, which were originally constructed in the 1920s and rebuilt in 1989.

22.    Between Batteries 13 and 14 existed the "transfer area," which housed critical operational facilities including: (a) two control rooms called "reversing rooms" where operators monitored and controlled the coking process during entire shifts; (b) a break room where workers took meal and rest breaks; (c) personnel shacks; and (d) staircase access to the battery tops.

23.    Beneath the transfer area, in a confined space called the "basement," ran the high-pressure coke oven gas supply piping that fed processed gas to both batteries, including the Battery 13 gas isolation valve.

24.    A cross section of Batteries 13 and 14 is shown in this photograph:



25.     The occupied reversing rooms and break room in the transfer area were located merely 10-20 feet directly above the high-pressure coke oven gas supply piping in the basement.

26.     These buildings were ordinary industrial structures providing weather protection and workspace—not blast-resistant structures designed to withstand explosions.

27.     This configuration violated fundamental facility siting principles codified in industry guidance from the Center for Chemical Process Safety ("CCPS") and the American Petroleum Institute ("API"), which require separation of occupied buildings from major process explosion hazards or, alternatively, blast-resistant construction to protect occupants.

**III.    The 1998-2018 Process Hazard Analyses: Ignored Warnings and Rejected Recommendations**

28.     The Occupational Safety and Health Administration's ("OSHA") Process Safety Management ("PSM") standard, 29 C.F.R. § 1910.119, requires comprehensive hazard analysis and facility siting evaluation for processes containing 10,000 or more pounds of flammable gas.

29.     Between 1998 and 2018, U.S. Steel conducted five Process Hazard Analyses ("PHAs") of its Clairton coke oven gas system: in 1998, 2003, 2008, 2013, and 2018.

30.     Documents from the 1998, 2003, and 2008 PHAs explicitly stated that facility siting—a required PSM element—was not considered by the PHA teams.

31.     In 2003, the PHA team issued a specific written recommendation to site management urging U.S. Steel to conduct a facility siting study of the coke batteries to evaluate whether occupied buildings were appropriately located relative to explosion hazards.

32.     Clairton management rejected the 2003 facility siting recommendation, providing written justification stating: "The [coke oven gas] system is not explicitly covered by OSHA's [PSM] regulation. Accordingly, elements of PSM are selectively applied to this system as deemed necessary and appropriate by Clairton Works management. Elements applied are considered adequate to ensure employee safety and operational integrity. Therefore, management does not consider it necessary to conduct the activities as recommended."

33.     This rejection was based on U.S. Steel's interpretation that coke oven gas qualified for the PSM "fuels exemption," which excludes "hydrocarbon fuels used solely for workplace consumption as fuel."

34.     U.S. Steel's interpretation was initially supported by OSHA's 1992 "King Letter," which stated that coke oven gas used as fuel fell within the fuels exemption.

## IV.     The 2013 OSHA Wilkins Letter: Clarification That PSM Applies to Coke Oven Gas

35.     On February 4, 2013, OSHA issued a Letter of Interpretation known as the "Wilkins Letter," which explicitly rescinded the 1992 King Letter and clarified that coke oven gas does NOT qualify for the fuels exemption.

36.     The Wilkins Letter stated that coke oven gas fails to meet the definition of "hydrocarbon," which OSHA defined as "an organic compound consisting exclusively of carbon and hydrogen."

37.     Because coke oven gas contains significant quantities of nitrogen, carbon monoxide, and other non-hydrocarbon constituents, it cannot be considered a hydrocarbon fuel.

38.     The Wilkins Letter unambiguously concluded that processes containing more than 10,000 pounds of coke oven gas (as did Clairton) are covered by the PSM standard and must comply with all PSM requirements, including facility siting evaluation.

39.     Despite this clear 2013 regulatory clarification, U.S. Steel continued to maintain that its coke oven gas supply process was not covered by PSM and continued to apply PSM requirements only selectively as management deemed "necessary and appropriate."

40.     U.S. Steel never conducted a comprehensive facility siting evaluation of the Clairton Coke Works facility following the 2013 Wilkins Letter, despite twelve years of opportunity to do so before the fatal explosion.

41.     The 2018 PHA, the final PHA conducted before the explosion, claimed that facility siting was addressed "qualitatively" and that "specific discussion relative to facility siting is documented throughout the [PHA] worksheets."

42.     However, no substantive documentation of any actual facility siting analysis was provided, representing mere checkbox compliance without meaningful evaluation.

43.     Throughout this entire period from 2003 through August 11, 2025, spanning twenty-two years, the physical layout of the Battery 13/14 area remained unchanged.

44.     Workers continued to be stationed in the reversing rooms and break room located 10-20 feet directly above the high-pressure coke oven gas piping, completely unaware they were

positioned atop a catastrophic explosion hazard that their employer had been repeatedly warned about and consistently refused to address.

**V.    Nippon Steel's Acquisition and Ratification of the "Blast Zone" Hazard**

45.    On December 16, 2023, Nippon Steel and U.S. Steel announced a definitive agreement whereby Nippon Steel would acquire all of U.S. Steel for approximately $14.1 billion plus the assumption of debt representing a total enterprise value of $14.9 billion.

46.    In June 2025, two months *before* Timothy Quinn's death, Nippon Steel finalized its acquisition of United States Steel Corporation, making U.S. Steel a wholly owned subsidiary and bringing all U.S. Steel assets, including the Clairton Coke Works facility, under Nippon Steel's ownership and operational control.

47.    As part of the standard pre-closing due diligence process required for an acquisition of this magnitude, Nippon Steel's executives, engineers, and legal counsel conducted comprehensive review of U.S. Steel's operations, assets, liabilities, and regulatory compliance status.

48.    During this due diligence review, Nippon Steel took possession of and reviewed U.S. Steel's safety records for the Clairton facility, including the complete history of Process Hazard Analyses conducted from 1998 through 2018.

49.    Specifically, Nippon Steel's due diligence team reviewed and took possession of the 2003 PHA documentation, which contained both the facility siting study recommendation and management's written rejection of that recommendation.

50.    Nippon Steel's review revealed that U.S. Steel management had explicitly refused to conduct facility siting evaluation based on the rationale that the coke oven gas system was "not explicitly covered by OSHA's PSM regulation" and that PSM elements were being "selectively

applied... as deemed necessary and appropriate by Clairton Works management."

51.     Nippon Steel's legal and compliance personnel, conducting regulatory due diligence, were aware of or should have been aware of OSHA's 2013 Wilkins Letter, which had invalidated U.S. Steel's fuels exemption interpretation and established that coke oven gas systems are subject to full PSM compliance.

52.     Nippon Steel therefore knew, or through the exercise of reasonable diligence should have known, that the Clairton Coke Works facility had been operating in violation of federal PSM requirements for twelve years since the 2013 Wilkins Letter, and that occupied buildings housing workers were improperly sited in close proximity to major explosion hazards without required evaluation or mitigation.

53.     Nippon Steel's engineering and safety personnel, reviewing the facility layout and the proximity of the reversing rooms and break room to the high-pressure coke oven gas piping, knew or should have known that workers were positioned in what facility siting experts term a "blast zone"—the area subject to catastrophic overpressure and structural destruction in the event of a vapor cloud explosion.

54.     Upon finalizing the acquisition, Nippon Steel did not remain a passive shareholder.

55.     Instead, it affirmatively undertook the duty of operational oversight by integrating the Clairton facility into its global safety management structure.

56.     Upon completing its acquisition in June 2025, Nippon Steel possessed absolute authority and operational control to order immediate corrective action, including: (a) implementing a comprehensive safety stand-down to conduct overdue facility siting evaluations; (b) temporarily shutting down operations at Battery 13/14 until occupied buildings could be relocated or retrofitted with blast-resistant construction; (c) immediately relocating workers from the transfer area

buildings to temporary safe locations pending permanent solutions; or (d) implementing any combination of measures necessary to remove workers from imminent danger.

57.     Industry standards and corporate governance principles applicable to acquiring companies require that when a purchaser discovers serious safety deficiencies during due diligence—particularly deficiencies involving imminent danger to human life—the acquiring company must take immediate corrective action upon assuming operational control, even if such action requires operational disruption or expense.

58.     Nippon Steel made a conscious corporate decision not to exercise its authority to implement safety corrections.

59.     Despite knowing that the Clairton facility was operating with occupied buildings improperly sited in blast zones, and despite knowing that required facility siting evaluations had been rejected for over twenty years, Nippon Steel authorized continued operations without interruption.

60.     This decision constituted ratification of the dangerous condition.

61.     By taking ownership of the facility with knowledge of the blast zone hazard, by possessing authority to order immediate correction, and by consciously deciding to maintain operations without implementing safety measures, Nippon Steel adopted U.S. Steel's prior negligence as its own and assumed direct responsibility for the consequences.

62.     Nippon Steel's decision to continue operations was motivated by prioritization of revenue over worker safety.

63.     Shutting down Battery 13/14 for facility siting evaluation and corrective construction would have required taking the batteries offline, disrupting coke production, reducing revenue, and incurring substantial capital expenditure for building relocation or blast-resistant

construction.

64.     Nippon Steel had the exclusive power to authorize the $11 Billion in capital improvements.

65.     By failing to immediately release emergency safety funds or make safety funding a condition of the closing, they effectively starved the U.S. management team of the resources needed to fix the Blast Zone.

66.     Nippon Steel chose to avoid these costs and maintain revenue flow despite knowledge of imminent danger to workers.

67.     This constituted conscious disregard of known risks.

68.     Nippon Steel was not ignorant of the hazard or reasonably mistaken about safety adequacy.

69.     The company possessed specific documentary evidence that facility siting evaluation had been recommended and rejected, possessed regulatory knowledge that PSM compliance was required, and possessed engineering knowledge that workers were positioned in blast zones.

70.     Nippon Steel's decision to authorize continued operations in the face of this knowledge demonstrated conscious disregard of risks to worker safety.

71.     From June 2025 through August 11, 2025, a period of approximately two months during which Nippon Steel exercised complete operational control, the company took no action to address the facility siting hazard.

72.     No facility siting evaluation was ordered.

73.     No temporary relocation of workers was implemented. No blast-resistant construction was initiated.

74.    No operational restrictions were imposed to minimize worker exposure.

75.    The dangerous status quo continued unchanged under Nippon Steel's ownership.

76.    But for Nippon Steel's refusal to exercise its power to shut down the unsafe facility immediately upon acquisition, the Battery 13/14 batteries would have been offline on August 11, 2025, conducting overdue facility siting evaluation and safety modifications.

77.    The valve exercising operation that triggered the explosion would not have been performed.

78.    Timothy Quinn would not have been present in the Battery 14 reversing room.

79.    The explosion, even if it had somehow occurred during shutdown operations, would not have killed or injured workers because they would have been relocated to safe locations pending completion of permanent facility siting corrections.

80.    Nippon Steel's direct corporate negligence in ratifying and perpetuating the blast zone hazard was a substantial factor in causing Timothy Quinn's death.

81.    Notwithstanding Nippon Steel's acquisition of U.S. Steel, the employees of the Clairton plant remained employees of U.S. Steel and at least as of the time of the August 2025 explosion received their paychecks from U.S. Steel.

## VI.    The 2013 Valve Refurbishment: Valves Inc.'s Failure to Advise Against Continued Service

82.    The Battery 13 gas isolation valve was an 18-inch cast iron double disc gate valve originally fabricated by Chapman Valve Manufacturing Company in 1953, making it sixty years old at the time of refurbishment and seventy-two years old at the time of catastrophic failure.

83.    The valve body bore markings indicating a pressure rating of fifty pounds per square inch gauge ("psig"), a modest rating reflecting both the valve's age and the inherent

limitations of cast iron as a pressure-containing material.

84.     In 2013, U.S. Steel contracted with Defendant Valves Inc., a specialized valve refurbishment company with expertise in valve materials, design, and service suitability, to perform the service of evaluating and refurbishing the Battery 13 gas isolation valve.

85.     Cast iron is inherently brittle with limited ductility, tending to crack rather than deform under stress.

86.     This brittleness becomes more pronounced with age as the material undergoes repeated thermal cycling, stress corrosion, and metallurgical degradation.

87.     Cast iron is particularly susceptible to thermal shock—rapid temperature changes that can initiate cracks that propagate catastrophically through the brittle material.

88.     In coke oven gas service, these material limitations are especially problematic due to: (a) exposure to hot gas from ovens operating at 2,000°F; (b) corrosive compounds and tar-like residues in coke oven gas that degrade sealing surfaces and attack valve body material; and (c) repeated thermal cycles during operational variations and maintenance shutdowns, contributing to cumulative material degradation.

89.     When Valves Inc. received the sixty-year-old cast iron valve for refurbishment in 2013, the valve had already operated for six decades in demanding service without prior documented major overhaul—an extraordinarily long service life for any valve, particularly one in such harsh conditions.

90.     As a specialized valve refurbishment company, Valves Inc. possessed superior technical expertise regarding valve materials, design limitations, suitability for specific service conditions, expected service life, and the risks of continuing to operate aged cast iron valves in high-consequence applications.

91.    Valves Inc.'s scope of work included replacing internal components such as disc, seat rings, packing, and stem, along with machining or lapping sealing surfaces to restore shutoff capability.

92.    While these actions address wear of internals, refurbishing internal components cannot address fundamental limitations or degradation in the valve body material itself.

93.    Valves Inc. knew or should have known that a sixty-year-old cast iron valve body, regardless of how well internals could be refurbished, represented an unacceptable risk for continued service in a critical safety application like coke oven gas isolation where valve failure could result in catastrophic explosion and worker death.

94.    Valves Inc. owed a professional duty to advise U.S. Steel that while refurbishment was technically feasible, returning this aged cast iron valve to service was not recommended, and that replacement with a modern steel valve designed for the specific service conditions was the appropriate and necessary course of action.

95.    Valves Inc. negligently failed to provide this critical safety advice.

96.    The company either failed to recognize the unsuitability of the aged cast iron valve for continued service—demonstrating incompetence in their specialized field—or recognized the risk but failed to communicate it to U.S. Steel—demonstrating negligent omission of professional responsibility.

97.    Valves Inc.'s failure to advise against continued service was a substantial contributing factor to the valve remaining in operation for an additional twelve years until its catastrophic failure on August 11, 2025.

98.    Had Valves Inc. fulfilled its professional duty and recommended replacement rather than refurbishment, U.S. Steel would likely have installed a modern steel valve in 2013, and

that valve would have remained in service without catastrophic failure when subjected to the August 11, 2025, exercising operation.

99.     The material properties differentiating steel from cast iron are fundamental and well-established in engineering science: steel's tensile strength is 2-3 times higher than cast iron (60,000-70,000 psi versus 20,000-30,000 psi); steel's fracture toughness is approximately 10 times higher than cast iron; and critically, steel's ductility allows it to deform extensively before failure while cast iron fails suddenly by brittle fracture with no warning and no capacity for deformation.

100.    These superior properties of steel are precisely why modern valve industry standards, including API Recommended Practice 600 for steel gate valves, specify steel construction for critical applications, and why cast iron valves are no longer manufactured for high-consequence service where failure could result in catastrophic release of hazardous materials.

**VII.    July 2025: The Cracked Valve Discovery and Planned Maintenance Outage**

101.    On July 8, 2025, a U.S. Steel employee identified a coke oven gas leak from a valve downstream of the Battery 13 gas isolation valve.

102.    In fact, the valve was cracked near one of its flanges.

103.    To replace the damaged valve, a maintenance outage was planned requiring closure of the Battery 13 gas isolation valve to isolate gas flow, purging of downstream piping, and opportunistic replacement of at least three additional valves during the same shutdown.

104.    MPW was contracted to provide personnel and pumping equipment to assist in "exercising" the Battery 13 gas isolation valve, specifically requesting a pump to flush residue from the valve seat.

105.    MPW is a specialized provider of industrial cleaning and support services, including the use of pressurized water for maintenance applications.

106.    The company markets itself as an expert in industrial solutions, contracting with major manufacturing facilities like the Clairton Coke Works to provide equipment and personnel for high-hazard tasks such as clearing obstructions in process piping.

## VIII.    August 11, 2025: The Accelerated Decision and MPW's Involvement

107.    On August 11, 2025, eight days before the planned August 19 outage, MPW decided to exercise the Battery 13 gas isolation valve immediately rather than waiting for the scheduled maintenance.

108.    MPW mobilized three employees to the Clairton facility with a positive displacement pump, hoses, and fittings, arriving at approximately 10:30 AM.

109.    MPW did this without having participated in the July 28, 2025 hazard analysis meeting.

110.    MPW did this without obtaining a comprehensive briefing on the specific hazards of the coke oven gas system.

111.    The Clairton plant's written procedure for exercising battery gas isolation valves specifically allowed introduction of *steam* into the valve body to heat it prior to exercising, with maximum steam pressure of ten psig.

112.    The Clairton plant's procedure made no mention of water injection.

113.    Despite the procedural specification for steam, MPW opted to use pressurized liquid water instead—a deviation from procedure that would prove catastrophic.

## IX.    The Hydrostatic "Bomb": MPW's Creation of Catastrophic Over-Pressurization

114.    At approximately 10:30 AM on August 11, 2025, three MPW employees gathered at the Battery 13 gas isolation valve in the confined basement space beneath the Battery 13/14 transfer area.

115.    Each worker carried personal carbon monoxide monitors, and one carried a four-gas monitor to detect oxygen, carbon monoxide, hydrogen sulfide, and flammable gas—standard safety practice for work in areas where hazardous atmospheres might develop.

116.    The Battery 13 gas isolation valve was actively in service with pressurized coke oven gas flowing through it to supply fuel to Battery 13's heating system.

117.    At that time, MPW began pumping liquid water under pressure into the valve body through a cleanout port using a Butterworth brand water jetting system (Model Number TF-450MB, MPW Unit Number B130208), directing the water flow toward the valve seat to flush away accumulated residue. OSHA's subsequent investigation determined that MPW was operating this system at a water pressure of approximately 3,000 psi.

118.    By choosing to utilize a positive displacement pump to flush the Battery 13 Gas Isolation Valve, MPW introduced a piece of equipment that operates on a fundamentally dangerous principle for this specific application: it forces a fixed volume of fluid into the discharge pipe with every rotation, regardless of the resistance it encountered.

119.    Unlike centrifugal pumps, which simply "churn" fluid when blocked, a positive displacement pump has no internal limit on the pressure it generates; if the discharge path is closed, the pressure rises instantly and theoretically *infinitely* until the weakest component in the system ruptures.

120.    When MPW connected this high-force pump to the closed, 50-psig-rated cast iron valve and injected water—an incompressible fluid—at approximately 3,000 psi, they subjected the seventy-two-year-old valve to forces approximately sixty times its design pressure rating, creating a "hydrostatic lock" that made catastrophic valve failure inevitable.

121.    The Butterworth water jetting system used by MPW was not equipped with a

pressure relief valve—a basic safety device that automatically vents pressure to prevent equipment failure when system pressure exceeds safe operating limits. Had MPW's equipment included a functioning pressure relief valve, the catastrophic overpressurization of the valve body could have been prevented or mitigated. OSHA specifically cited MPW for operating the water jetting system without the ability to rapidly depressurize the system.

122.    Because water cannot be compressed to accommodate the incoming volume, the internal pressure within the valve body spiked violently and immediately.

123.    An MPW worker observed water leaking from the valve's bonnet flange—a connection that should have been sealed under normal conditions—indicating that internal pressure had increased beyond design levels and was compromising valve integrity.

124.    Notwithstanding this observation, MPW did not immediately stop the water injection process.

125.    This massive hydrostatic load overwhelmed the aged cast iron, causing the "bonnet flange leak" that workers observed as the bolts stretched, followed seconds later by the "fully circumferential crack" that split the valve body entirely open, as shown in this photograph:



Battery 13 gas isolation valve

126.    By failing to recognize that their specific pump type would act as a hydraulic ram against the closed valve and stopping it when the valve began to fail, MPW turned a routine maintenance task into a mechanical demolition of a critical safety infrastructure.

127.    Coincidental to the valve rupture, workers heard a distinct "pop" sound.

128.    Pressurized coke oven gas rushed out through the failed valve at high velocity, rapidly filling the confined basement space and rising toward the occupied buildings 10-20 feet above.

129.    Workers could smell the characteristic sulfurous odor of coke oven gas.

130.    Workers' gas detection monitors began alarming, indicating detection of flammable gas or carbon monoxide, demonstrating that coke oven gas was escaping from the valve system.

131.    Recognizing the danger, all nearby workers were directed to evacuate the basement.

132.    The released gas reached explosive concentration exceeding its 4.4% lower explosive limit and contacted an ignition source—likely one of the numerous hot surfaces present

in the active coke works environment where ovens operated at 2,000°F and piping, equipment, and structural elements exceeded the 1,065°F autoignition temperature of hydrogen.

133.    The explosion occurred at approximately 10:47 AM—less than one minute after the radio evacuation call.

134.    The resulting explosion propagated through the confined basement with devastating force, generating a powerful pressure wave that radiated outward and upward, impacting the non-blast-resistant structures of the Battery 13/14 transfer area with catastrophic overpressure.

**X.    Timothy Quinn's Death and the Destruction of the Transfer Area**

135.    At the time of the explosion, Timothy Quinn was performing his assigned duties as an operator in the Battery 14 reversing room, positioned at his normal workstation approximately 10-20 feet directly above the failed valve and explosion epicenter.

136.    The explosion pressure wave traveled upward through the transfer area structure, striking the Battery 14 reversing room with force that the ordinary industrial building was never designed to withstand, as demonstrated by the below photograph:



**Figure 2**. Surveillance images of the initial moments of the explosion, overlooking the top of Battery 14 and the Battery 13/14 transfer area. (Credit: U.S. Steel, annotated by CSB)

137.    The reversing room structure failed catastrophically.

138.    Walls collapsed, the roof was lifted and blown away, and structural elements disintegrated under the explosive overpressure.

139.    Timothy Quinn was struck by the pressure wave, impacted by collapsing structural elements, bombarded by flying debris, and subjected to the full force of an industrial explosion at close range, and died as a result.

140.    Timothy Quinn's death was not instantaneous but resulted from traumatic injuries sustained when the explosion destroyed the building he was working in—injuries including blunt force trauma from structural collapse, penetrating trauma from flying debris, and other catastrophic injuries consistent with being present at close range to an industrial vapor cloud explosion.

**XI.    OSHA's Post-Incident Investigation and Citations**

141.    Following the August 11, 2025 explosion, the United States Department of Labor's Occupational Safety and Health Administration ("OSHA") conducted a comprehensive investigation of the incident at the Clairton Coke Works facility, spanning from August 2025 through early February 2026.

142.    On February 9, 2026, OSHA issued Citations and Notifications of Penalty to both U.S. Steel (Inspection Number 1843132) and MPW (Inspection Number 1843671), identifying multiple serious violations of federal workplace safety standards directly related to the August 11, 2025 explosion that killed Timothy Quinn.

143.    OSHA cited U.S. Steel for a total of ten violations carrying proposed penalties of $118,214.00. Seven of these violations were classified as "Serious," meaning OSHA determined that the violations created a substantial probability of death or serious physical harm.

144.    Specifically, OSHA found that U.S. Steel violated 29 C.F.R. §

1910.119(d)(2)(i)(C) by failing to include the maximum intended inventory of coke oven gas in the process technology information for the Underfire System, Foul Gas System, Chemical Processing System, and Down River System. OSHA determined that this failure "exposed employees working in and around the process to an explosion hazard when cryogenically-processed coke oven gas was released from 13 Pad Valve."

145.    OSHA found that U.S. Steel violated 29 C.F.R. § 1910.119(e)(6) by failing to update and revalidate its Process Hazard Analysis of the Underfire Gas System at least every five years as required. The most recent revalidation had been conducted in November 2018, making it overdue by late 2023—nearly two years before the fatal explosion. OSHA's citation of this violation independently confirms that the PSM standard applies to U.S. Steel's coke oven gas system, directly contradicting U.S. Steel's historical position that its coke oven gas process was exempt from PSM requirements.

146.    OSHA found that U.S. Steel violated 29 C.F.R. § 1910.119(f)(4) by failing to develop and implement safe work practices, including lockout/tagout procedures, for the control of chemical energy while employees cleaned the seat of the Battery 13 gas isolation valve with water when cryogenically-processed coke oven gas was present in the valve and Underfire lines.

147.    OSHA found that U.S. Steel violated 29 C.F.R. § 1910.119(j)(2) by failing to establish written procedures to maintain the ongoing integrity of the Battery 13 gas isolation valve—the very valve whose catastrophic failure caused the explosion that killed Timothy Quinn.

148.    OSHA found that U.S. Steel violated 29 C.F.R. § 1910.119(j)(3) by failing to train employees involved in maintaining the ongoing integrity of the Battery 13 gas isolation valve in the procedures applicable to washing the valve with water to ensure employees could

perform the task safely.

149.    OSHA found that U.S. Steel violated 29 C.F.R. § 1910.147(c)(4)(ii) because its procedures for the control of hazardous energy did not clearly and specifically outline the scope, purpose, authorization, rules, and techniques to be used to control chemical energy when employees cleaned the valve seat while coke oven gas was present.

150.    OSHA found that U.S. Steel violated 29 C.F.R. § 1910.147(d)(3) by failing to ensure that energy isolating devices were operated in a manner to isolate the Battery 13 gas isolation valve from cryogenically-processed coke oven gas while employees cleaned the valve with water. OSHA further found that because of U.S. Steel's failure to isolate the valve, "the remaining applicable energy control elements involving LOTO device application, stored energy, and verification of isolation, were not implemented to safeguard employees."

151.    OSHA found that U.S. Steel violated 29 C.F.R. § 1910.147(f)(2)(i) by failing to inform MPW of U.S. Steel's lockout/tagout procedures before MPW's employees engaged in cleaning the Battery 13 gas isolation valve with water while coke oven gas was present. This confirms that U.S. Steel sent MPW's workers into the hazardous operation without providing the safety information necessary to protect them.

152.    OSHA additionally cited U.S. Steel for failing to provide OSHA inspectors with required incident reports within four business hours of the request. OSHA requested the OSHA Form 301 Incident Reports for the eight injuries resulting from the August 11, 2025 explosion on August 20, 2025. U.S. Steel did not provide these reports until February 5, 2026—more than five months after the request.

153.    OSHA cited MPW for a total of eight violations carrying proposed penalties of $61,473.00, including four "Serious" violations directly related to the August 11, 2025

explosion.

154.    OSHA found that MPW violated the General Duty Clause of the OSH Act,
Section 5(a)(1), by exposing employees to struck-by and high-pressure injection hazards through
the use of a Butterworth brand water jetting system (Model Number TF-450MB, MPW Unit
Number B130208) that was not equipped with a pressure relief valve. OSHA found that MPW
employees were "operating the high-pressure water jetting system without the ability to rapidly
depressurize the system which can result in severe waterjet injuries."

155.    OSHA separately found that MPW violated the General Duty Clause by exposing
employees to coke oven gas while using the same high-pressure water jetting system to flush the
Battery 13 gas isolation valve. OSHA's citation confirmed that MPW was operating the water
jetting system at a water pressure of approximately 3,000 psi to flush the Chapman Valve
Manufacturing Company brand 18-inch cast iron double gate valve (Model Number L58 1/2),
which contained flammable coke oven gas. The 3,000 psi operating pressure was approximately
sixty times the valve's 50 psig pressure rating. OSHA found that "[t]he gate valve ruptured
during this process causing an uncontrolled release of coke oven gas and a subsequent
explosion."

156.    OSHA found that MPW violated four separate provisions of the permit-required
confined space standard, 29 C.F.R. § 1910.146: (a) failing to identify and evaluate the hazards of
the 13/14 pad valve pit before employees entered (29 C.F.R. § 1910.146(d)(2)); (b) failing to
develop and implement the means, procedures, and practices necessary for safe permit space
entry operations (29 C.F.R. § 1910.146(d)(3)); (c) failing to test conditions in the pit to
determine if acceptable entry conditions existed before entry was authorized (29 C.F.R. §
1910.146(d)(5)(i)); and (d) failing to prepare an entry permit before entry was authorized (29

C.F.R. § 1910.146(e)(1)). The 13/14 pad valve pit had been classified by U.S. Steel as a permit-required confined space.

157.    OSHA found that MPW violated 29 C.F.R. § 1910.147(f)(2)(i) by failing to inform U.S. Steel of MPW's lockout/tagout procedures before flushing the gate valve with high-pressure water. OSHA specifically noted that the gate valve "was not isolated or purged of flammable coke oven gas" and that it "split open during the flushing process which resulted in the uncontrolled release of coke oven gas and a subsequent explosion."

158.    OSHA further cited MPW for failing to maintain written certification of permit-required confined space training for its employees, and for failing to certify that employee training related to MPW's Energy Control Program had been accomplished and was up to date.

**COUNT I**
**NEGLIGENCE - SURVIVAL**
**<u>Trisha Lynn Quinn, individually and as Administrator of the Estate of Timothy L. Quinn</u>**
**<u>v. Nippon Steel North America, Inc.</u>**

159.    Plaintiff incorporates all previous paragraphs of this Complaint as if set forth more fully herein.

160.    The harm, injuries, death, and damages hereinafter set forth were a direct and proximate result of the negligent, careless, and reckless conduct of the Defendant Nippon Steel and its agents, employees or servants in some or all of the following ways:

a.    In failing to require, as a condition of the acquisition, that U.S. Steel complete overdue facility siting evaluations and implement required mitigation measures before Nippon Steel assumed operational control in June 2025.

b.    In failing to recognize during due diligence that OSHA's 2013 Wilkins Letter had invalidated U.S. Steel's fuels exemption interpretation and established that the Clairton facility had been operating in violation of mandatory PSM requirements for twelve years.

c.    In failing to recognize that the 2003 PHA recommendation for facility siting

study and management's written rejection thereof represented an unmitigated critical hazard requiring immediate remediation, not a resolved compliance matter.

d. In failing to order an immediate safety stand-down upon completing the acquisition in June 2025 to conduct overdue facility siting evaluations before authorizing continued operations at Battery 13/14.

e. In failing to exercise its absolute authority as owner to shut down Battery 13/14 operations temporarily pending completion of facility siting evaluation and implementation of required protective measures.

f. In failing to implement emergency temporary relocation of workers, including Timothy Quinn, from the Battery 13/14 reversing rooms and break room to safe locations outside the blast zone during the June-August 2025 period.

g. In failing to commission and complete comprehensive facility siting evaluation of the Battery 13/14 occupied buildings within the two-month window between acquisition (June 2025) and the fatal explosion (August 11, 2025).

h. In failing to retain qualified facility siting consultants with expertise in vapor cloud explosion consequence modeling to evaluate whether occupied buildings 10-20 feet above high-pressure coke oven gas piping provided adequate protection to workers.

i. In failing to perform explosion consequence modeling to quantify the overpressure that would impact the reversing rooms and break room in the event of coke oven gas release and ignition in the basement directly below.

j. In failing to relocate the Battery 13/14 reversing rooms and break room to positions at safe distances from the coke oven gas piping, consistent with the hierarchy of controls in API Recommended Practices 752, 753, and 756.

k. In failing to design and construct blast-resistant control rooms to replace the existing non-blast-resistant reversing rooms when immediate relocation was not operationally feasible.

l. In failing to establish exclusion zones or administrative controls limiting worker presence in the Battery 13/14 transfer area buildings pending completion of

facility siting evaluation and implementation of permanent protective measures.

m.  In failing to identify the seventy-two-year-old cast iron Battery 13 gas isolation valve as a critical component requiring immediate replacement due to age, material brittleness, and high-consequence failure potential in an application where failure would release flammable gas in proximity to occupied buildings.

n.  In failing to restrict or prohibit maintenance operations on aged cast iron valves, particularly operations involving thermal shock from water injection, pending replacement with suitable modern steel valves.

o.  In failing to repudiate U.S. Steel's 2003 management decision rejecting the facility siting recommendation, and instead ratifying that dangerous decision by authorizing continued operations without conducting the evaluation that had been recommended twenty-two years earlier.

p.  In failing to repudiate the configuration of occupied buildings positioned 10-20 feet above high-pressure flammable gas piping, and instead ratifying that blast zone configuration by assigning Timothy Quinn and other workers to continue reporting to those buildings for their shifts.

q.  In failing to prioritize worker safety over production continuity and short-term financial performance by authorizing continued operations at Battery 13/14 despite documented knowledge that workers were positioned in improperly-sited buildings subject to catastrophic explosion hazards.

r.  In failing to allocate adequate capital budget and engineering resources to address the facility siting deficiencies as an urgent priority immediately upon acquisition, instead deferring these expenditures to avoid operational disruption and maintain revenue flow.

s.  In failing to warn Timothy Quinn and other workers positioned in the Battery 13/14 transfer area that they were located in close proximity to high-pressure coke oven gas piping, that this configuration had never been evaluated through proper facility siting analysis, and that Nippon Steel had identified this as a potential safety deficiency during acquisition due diligence.

t.  In failing to exercise the authority that only Nippon Steel possessed as parent company and owner to immediately shut down Battery 13/14 upon acquisition in June 2025, which failure directly caused the facility to be operational on

August 11, 2025, directly caused Timothy Quinn to be present in the improperly-sited Battery 14 reversing room, and directly caused his death when the foreseeable explosion occurred.

u.  In failing to ensure that the Underfire Gas System Process Hazard Analysis was updated and revalidated within the five-year period required by 29 C.F.R. § 1910.119(e)(6), which revalidation was overdue by late 2023—before Nippon Steel completed its acquisition in June 2025—and which failure OSHA subsequently confirmed through its citation of U.S. Steel for this specific violation.

v.  In failing to ensure, upon assuming operational control in June 2025, that the process technology information for the Clairton coke oven gas system included the maximum intended inventory of coke oven gas, as required by 29 C.F.R. § 1910.119(d)(2)(i)(C), which omission prevented adequate hazard evaluation and which OSHA subsequently confirmed through its citation of U.S. Steel.

w.  In failing to ensure that U.S. Steel had developed and implemented safe work practices, including lockout/tagout procedures, for the control of chemical energy during maintenance operations on the Battery 13 gas isolation valve, as required by 29 C.F.R. § 1910.119(f)(4), which failure OSHA subsequently confirmed through its citation of U.S. Steel.

x.  In failing to ensure that written procedures existed to maintain the ongoing integrity of the Battery 13 gas isolation valve, as required by 29 C.F.R. § 1910.119(j)(2), and in failing to ensure that employees were trained in proper valve maintenance procedures, as required by 29 C.F.R. § 1910.119(j)(3), which failures OSHA subsequently confirmed through its citations of U.S. Steel.

y.  In failing to ensure that U.S. Steel informed outside contractors, including MPW, of U.S. Steel's lockout/tagout procedures before permitting those contractors to perform work on equipment containing coke oven gas, as required by 29 C.F.R. § 1910.147(f)(2)(i), which failure OSHA subsequently confirmed through its citation of U.S. Steel.

z.  In failing to ensure that U.S. Steel isolated the Battery 13 gas isolation valve from cryogenically-processed coke oven gas before authorizing maintenance work on the valve, as required by 29 C.F.R. § 1910.147(d)(3), thereby permitting MPW's employees and U.S. Steel's own employees, including Timothy Quinn, to work in proximity to a live coke oven gas system without any energy isolation safeguards.

161.  As the direct and proximate result of Defendant Nippon Steel's negligent, careless, and reckless conduct as described herein, Mr. Quinn suffered conscious fear, pain and suffering

from the time he was notified to evacuate, through the time of the explosion and until the time of his death.

162.    As a direct and proximate result of Defendant Nippon Steels's negligent conduct, as described herein, Trisha Lynn Quinn, as the Administrator of the Estate of Timothy L. Quinn, claims damages for the following:

      a.  The conscious pain, suffering, fear, and anxiety suffered by Decedent;

      b.  The loss of earnings and economic loss to Decedent's estate, including, but not limited to, Decedent's total estimated future earning power less his cost of personal maintenance as a result of Decedent's death.

WHEREFORE, Plaintiff Trisha Lynn Quinn, as the Administrator of the Estate of Timothy L. Quinn, claims compensatory damages of this Defendant in an amount in excess of the arbitration limits of this County, plus costs and interest.

**COUNT II**
**NEGLIGENCE - SURVIVAL**
**Trisha Lynn Quinn, individually and as Administrator of the Estate of Timothy L. Quinn v. MPW Industrial Services, Inc.**

163.    Plaintiff incorporates all previous paragraphs of this Complaint as if set forth more fully herein.

164.    The harm, injuries, death, and damages hereinafter set forth were a direct and proximate result of the negligent, careless, and reckless conduct of the Defendant MPW and its agents, employees or servants in some or all of the following ways:

      a.  In failing to pump steam into the Battery 13 gas isolation valve as specified in U.S. Steel's written procedure, and instead pumping liquid water in direct violation of the procedural requirement, thereby creating an extreme risk of valve rupture that the procedure was designed to prevent.

      b.  In failing to question or clarify with U.S. Steel supervisory personnel why liquid water was being used when the written procedure explicitly specified steam with a maximum pressure of 10 psig, before commencing the pumping

operation.

c.  In failing to recognize that substituting liquid water for steam would create an extreme risk of valve rupture and explosion.

d.  In failing to insist on participating in the July 28, 2025 planning meeting for the Battery 13 maintenance outage, despite MPW's critical role in providing valve flushing services that would directly interface with pressurized coke oven gas systems.

e.  In failing to conduct an independent pre-job hazard analysis before mobilizing equipment and personnel to perform pressurized water injection into an active coke oven gas isolation valve.

f.  In failing to request and review the complete written procedure for exercising battery gas isolation valves before arriving at the job site, thereby arriving without knowledge of the steam specification or the reasons for that specification.

g.  In failing to obtain adequate information about the hazardous properties of coke oven gas—including its flammability (4.4% lower explosive limit), toxicity, composition (40-60% hydrogen), and autoignition temperature (1,065°F)—before performing work that could cause catastrophic release of this material.

h.  In failing to understand that the Battery 13 gas isolation valve was the sole barrier preventing coke oven gas from flowing into downstream piping, and that catastrophic failure of this valve while in service would result in immediate massive release of flammable gas into the confined basement space.

i.  In failing to recognize that the confined basement location where the valve was positioned, combined with the presence of multiple occupied buildings 10-20 feet directly above, created a high-consequence scenario where valve failure would likely result in explosion, structural collapse, and worker deaths.

j.  In failing to recognize, as industrial cleaning professionals with expertise in pressurized water applications, that introducing water into a pressurized system containing flammable gas presented unacceptable risks of pressure surge, equipment failure, and catastrophic release.

k.  In failing to refuse to perform the requested water injection operation when MPW's own professional judgment and expertise should have indicated that pumping water (rather than steam) into a seventy-two-year-old cast iron valve in active coke oven gas service was inherently unsafe.

l.  In failing to stop the water injection operation immediately upon observing the first signs of valve distress—specifically when water was observed leaking from the bonnet flange and gas monitors began alarming.

m.  In failing to bring steam generation equipment to the job site rather than liquid water pumping equipment, when the written procedure specified steam and when MPW as an industrial services contractor should have had the capability to provide the specified medium.

n.  In failing to assign personnel to the August 11, 2025 operation who had specific training and experience in performing valve maintenance on coke oven gas systems, rather than treating this as a routine water pumping job comparable to general industrial cleaning tasks.

o.  In failing to provide adequate pressure monitoring and control equipment that would have allowed MPW to precisely control injection pressure and immediately detect abnormal pressure conditions indicating valve distress or failure.

p.  In failing to establish clear communication protocols with U.S. Steel personnel before commencing the operation, including agreement on stop-work authority, emergency response procedures, and the specific observations or instrument readings that would trigger immediate work cessation.

q.  In failing to verify that all personnel in the basement work area and in occupied buildings above understood the hazards of the operation, the signs of equipment distress or coke oven gas release, and the immediate actions to take if problems developed.

r.  In failing to continuously monitor the four-gas detector readings during the water injection operation and to establish predetermined action levels that would trigger immediate cessation of pumping and evacuation, before gas concentrations reached explosive levels.

s.  In failing to immediately shut down the positive displacement pump and close

isolation valves on the water injection line at the first indication of gas release (when monitors alarmed), rather than continuing the operation or waiting for definitive instruction from U.S. Steel supervisors.

t.   In using a Butterworth brand water jetting system (Model Number TF-450MB, MPW Unit Number B130208) to flush the Battery 13 gas isolation valve at a water pressure of approximately 3,000 psi—approximately sixty times the valve's 50 psig design pressure rating—without recognizing that such extreme overpressurization of an aged cast iron valve would inevitably cause catastrophic failure.

u.   In operating the Butterworth water jetting system without a pressure relief valve, thereby depriving MPW's operators and all workers in the area of the single most critical safety device that could have prevented catastrophic overpressurization of the valve body and the resulting explosion.

v.   In failing to comply with the manufacturer's own guidance, as set forth in Butterworth Jetting Systems, Inc.'s General Information & Warranty Information documentation, which required that the "[p]rimary operator must have control of water pressure while the secondary operator observes from a safe distance," and in failing to comply with ASTM E1575-12, Standard Practice for Pressure Cleaning and Cutting, referencing automatic shutoff and dump devices, and the WJTA Industry Best Practices for the Use of High Pressure Water Jetting Equipment (2021).

w.   In entering the 13/14 pad valve pit—a space classified by U.S. Steel as a permit-required confined space—without identifying and evaluating the hazards of the space, without developing safe entry procedures, without testing atmospheric conditions, and without preparing an entry permit, all in violation of 29 C.F.R. § 1910.146.

x.   In failing to certify that its employees who entered the 13/14 pad valve pit had completed permit-required confined space training, and in failing to certify that its employees who participated in the valve flushing operation had completed training related to MPW's Energy Control Program.

y.   In failing to inform U.S. Steel of MPW's lockout/tagout procedures before flushing the gate valve, which was not isolated or purged of flammable coke oven gas, thereby ensuring that neither employer implemented adequate energy control measures to protect workers from the hazards of the operation.

165.   As the direct and proximate result of Defendant MPW's negligent, careless, and reckless conduct as described herein, Mr. Quinn suffered conscious fear, pain and suffering from the time he was notified to evacuate, through the time of the explosion and until the time of his

death.

166.    As a direct and proximate result of Defendant MPW's negligent conduct, as described herein, Trisha Lynn Quinn, as the Administrator of the Estate of Timothy L. Quinn, claims damages for the following:

    a.  The conscious pain, suffering, fear, and anxiety suffered by Decedent;

    b.  The loss of earnings and economic loss to Decedent's estate, including, but not limited to, Decedent's total estimated future earning power less his cost of personal maintenance as a result of Decedent's death.

WHEREFORE, Plaintiff Trisha Lynn Quinn, as the Administrator of the Estate of Timothy L. Quinn, claims compensatory damages of this Defendant in an amount in excess of the arbitration limits of this County, plus costs and interest.

## COUNT III
## NEGLIGENCE - SURVIVAL
## Trisha Lynn Quinn, individually and as Administrator of the Estate of Timothy L. Quinn v. Valves, Inc.

167.    Plaintiff incorporates all previous paragraphs of this Complaint as if set forth more fully herein.

168.    The harm, injuries, death, and damages hereinafter set forth were a direct and proximate result of the negligent, careless, and reckless conduct of the Defendant Valves, Inc., and its agents, employees or servants in some or all of the following ways:

    a.  In failing to recognize and advise U.S. Steel in 2013 that a sixty-year-old cast iron valve was inherently unsuitable for continued service in a critical coke oven gas isolation application where catastrophic failure would result in explosive release and worker deaths, regardless of how well internal components could be refurbished.

    b.  In failing to recognize that cast iron's inherent brittleness, susceptibility to thermal shock, and tendency to crack under stress—particularly after sixty years of thermal cycling, corrosive exposure, and metallurgical degradation in demanding coke oven gas service—rendered the valve body unsafe for continued use even if internal components were restored.

c.  In failing to perform or recommend non-destructive testing of the sixty-year-old cast iron valve body to identify microcracks, stress corrosion, material embrittlement, or other structural defects that would render the valve unsafe for continued service, before making any recommendation about refurbishment versus replacement.

d.  In failing to inquire about and evaluate the specific service conditions (coke oven gas composition, operating temperatures up to 2,000°F, thermal cycling, corrosive residues) and the high-consequence nature of this application (valve located 10-20 feet below occupied buildings) before determining whether refurbishment was appropriate.

e.  In failing to advise U.S. Steel explicitly and in writing that professional engineering standards and industry best practices required replacement rather than refurbishment of sixty-year-old cast iron valves in critical safety applications, and that modern steel valves designed for coke oven gas service were the appropriate and necessary solution.

f.  In failing to refuse to perform the refurbishment and instead provide U.S. Steel with a clear written recommendation stating: "This valve should NOT be returned to service due to age and material limitations. Replacement with a modern steel valve is required to ensure worker safety."

g.  In failing to recognize and communicate that refurbishing internal components addresses only wear and functionality but cannot remedy the fundamental problem of a sixty-year-old brittle cast iron pressure vessel that has reached the end of its safe service life and presents unacceptable risk of catastrophic failure.

h.  In failing to recognize that returning the refurbished valve to service would create a false sense of security—the valve would operate properly initially, masking the reality that the aged cast iron body was a brittle time bomb waiting for thermal shock or pressure surge to trigger catastrophic circumferential cracking.

i.  In failing to provide written documentation with the refurbished valve clearly stating the limitations of refurbishment, the age and material concerns, the fact that the valve body was not evaluated or upgraded, the risks of catastrophic failure, and the explicit recommendation that the valve be replaced rather than returned to service.

169.    As the direct and proximate result of Defendant Valves, Inc.'s negligent, careless, and reckless conduct as described herein, Mr. Quinn suffered conscious fear, pain and suffering from the time he was notified to evacuate, through the time of the explosion and until the time of his death.

170.    As a direct and proximate result of Defendant Valves, Inc.'s negligent conduct, as described herein, Trisha Lynn Quinn, as the Administrator of the Estate of Timothy L. Quinn, claims damages for the following:

    a.    The conscious pain, suffering, fear, and anxiety suffered by Decedent;

    b.    The loss of earnings and economic loss to Decedent's estate, including, but not limited to, Decedent's total estimated future earning power less his cost of personal maintenance as a result of Decedent's death.

WHEREFORE, Plaintiff Trisha Lynn Quinn, as the Administrator of the Estate of Timothy L. Quinn, claims compensatory damages of this Defendant in an amount in excess of the arbitration limits of this County, plus costs and interest.

## COUNT IV
## NEGLIGENCE – WRONGFUL DEATH
**Trisha Lynn Quinn, individually and as Administrator of the Estate of Timothy L. Quinn v. Nippon Steel North America, Inc., MPW Industrial Services, Inc., and Valves, Inc.**

171.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

172.    As a direct and proximate result of the negligent conduct of the Defendants respectively, as described herein, Mr. Quinn died prematurely.

173.    As a direct and proximate result of the negligent conduct of the Defendants respectively, Mr. Quinn's wrongful death beneficiaries have suffered the following damages:

    a.   They have lost and forever been denied the companionship, comfort, society, assistance, and support of Mr. Quinn;

    b.   They have incurred expenses for the funeral, burial, and estate administration for Mr. Quinn.

WHEREFORE, Plaintiff Trish Lynn Quinn, as the Administrator of the Estate of Timothy L. Quinn, claims compensatory damages of this Defendant in an amount in excess of the arbitration limits of this County, plus costs and interest.

**JURY TRIAL DEMANDED**

Respectfully submitted,

LUPETIN & UNATIN, LLC

By: _____
      Brendan B. Lupetin, Esquire
      Counsel for Plaintiff

**BENJAMIN J. BAER, ESQ.**

INJURY LAW PARTNERS

By:_____
      Benjamin J. Baer, Esquire
      Counsel for Plaintiff

### *Commonwealth of Pennsylvania - Short Certificate*
### *County of Westmoreland*



I, **Jonathon A. Wian**, Register for the Probate of Wills and Granting Letters of Administration in and for Westmoreland County, do hereby certify that on October 02, 2025, LETTERS OF ADMINISTRATION in common form were granted by the Register of said County, on the estate of

TIMOTHY L. QUINN, AKA: TIMOTHY LLOYD QUINN late of SOUTH HUNTINGDON TOWNSHIP in said county, deceased, to TRISHA LYNN QUINN and that same has not since been revoked.

**IN TESTIMONY WHEREOF,** I have here unto set my hand and affixed the seal of said office at WESTMORELAND, PENNSYLVANIA, on October 02, 2025.

**File No:**            6525-2305
**Date of Death :**  August 11, 2025
**S.S. #:**            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

_Jonathon A Wian_
_____
Register of Wills

**Jonathon A. Wian**
**Register of Wills & Clerk of Orphans' Court**
My Commission Expires First Monday, January, 2026.

**NOT VALID WITHOUT OFFICIAL SIGNATURE AND SEAL OF OFFICE**

# Exhibit A

## **VERIFICATION**

I,   Trisha Lynn Quinn                    , have read the foregoing COMPLAINT IN A CIVIL

ACTION.  The factual information therein which was provided by me to my attorneys is true and

correct to the best of my personal knowledge, information or belief.

Any other contents of the COMPLAINT IN A CIVIL ACTION, including additional

factual information, legal theories or conclusions of law, have been prepared by my attorneys, who

has signed the pleading, and are based upon their investigation and analysis of information

available to them and the applicable law.

I make this statement subject to the penalties of 18 Pa.C.S. §4904 relating to unsworn

falsification to authorities.

DATE:  02 / 04 / 2026

Trisha Lynn Quinn

## **CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania:  Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by:    Lupetin & Unatin, LLC

Signature:

Name:  Brendan Lupetin, Esquire

Attorney No. (if applicable):  201164

**Linda Stout**

| | |
|---|---|
| **From:** | webmaster.pro@county.allegheny.pa.us |
| **Sent:** | Friday, February 20, 2026 10:48 AM |
| **To:** | Linda Stout |
| **Cc:** | promail@alleghenycounty.us |
| **Subject:** | Approval Confirmation Submission ID: 3653242 CaseID: TMP1436956 |

# <u>Approval Details</u>

*Please be advised that dockets have been accepted by the*
*Allegheny County Department of Court Records, Civil/Family Division for Case*
*Number:GD-26-001916*
*Dockets filed for Temporary Case Number:TMP1436956*
*have been assigned to Permanent Case number:GD-26-001916*

| | |
|---|---|
| **Submission ID:** | 3653242 |
| **Status:** | Approved |
| **Case Number:** | GD-26-001916 |
| **Case Description:** | Quinn vs MPW Industrial Services Inc. etal |
| **Filing Date/Time:** | 2/19/2026 8:06:00 AM |

### <u>Docket Details are as follows:</u>

| ClientID | Filed By | Sequence nbr | Docket Type Code | Docket Type | Fees |
|---|---|---|---|---|---|
| | LDS1968 | 1 | COMPL | Complaint | 344.75 |

Payment Type : Credit Card
(There will be an additional 4% service charge on all Credit Card e-filings by the merchant card provider)
Civil/Family Division Amount :244.75
Sheriff's Amount :100
Total Amount :344.75
Receipt NO :9202037

**The Department of Court Records will not be assigning court dates to Arbitration matters as per Administrative Order AD-20-000095-PJ which was filed on March 16, 2020. Once the court resumes normal operations and the stay is lifted the Attorney/Litigant will be required to file a "Praecipe to Schedule an Arbitration Date" in order to receive a hearing date.**

**\*\*\*contact civil@alleghenycounty.us within 10 days on any issues \*\*\***

*Thank you for using the DCR, Civil/Family Division Electronic Filing and Retrieval System.*

**Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**ELI JOSEPH RUFFING and**
**CHELSI ANN RUFFING, his wife,**

          **Plaintiffs,**

**v.**

**MPW INDUSTRIAL SERVICES,**
**INC. and CRANE COMPANY,**

          **Defendants.**

**CIVIL ACTION**

**NO: 2:25-cv-01888-DSC**

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2026, I caused a true and correct copy of Plaintiffs' Notice of Supplemental Jurisdictional Facts in Support of Motion to Remand to State Court to be served via the Court's CM/ECF system on all counsel of record.

Christopher G. Mavros, Esquire and Theodore M. Schaer, Esquire
Zarwin, Baum, DeVito, Kaplan, Schaer & Toddy, P.C.
One Commerce Square
2005 Market Street | 16th Floor
Philadelphia, PA 19103
cgmavros@zarwin.com and tmschaer@zarwin.com

**FANELLI, EVANS AND PATEL, P.C.**

By: */s/ Albert J. Evans*
    ALBERT J. EVANS, ESQUIRE
    *Counsel for Plaintiffs*